UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| RON AND VICKI RUCSHNER, a marital community, and PACIFIC COAST SUPPLY, LLC, a Washington limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>RICHELIEU AMERICA, LTD., a foreign company, JOHN and "JANE DOE" STATTON, husband and wife, a Canadian marital community,<br><br>Defendants. | Case No. C05-5168RJB<br><br>ORDER |

This matter comes before the court on Plaintiffs' Motion for Partial Summary Judgment for Breach of Contract (Dkt. 15) and on Plaintiffs' Motion for Partial Summary Judgment to Dismiss Defendant Richelieu America, LTD.'s Counterclaims for Conversion (Dkt. 17). The court has considered the pleadings filed in support of and in opposition to the motion and the file herein.

PROCEDURAL AND FACTUAL BACKGROUND

On September 12, 2003, plaintiffs Ron and Vicki Rucshner (the Rucshners) sold their cabinet and cabinet hardware supply company, Pacific Coast Supply (Pacific Coast), to Richelieu America, Ltd, (Richelieu) a cabinet hardware supply company incorporated in Delaware and headquartered in Quebec, Canada. Richelieu purchased Pacific Coast through an Asset Purchase Agreement (APA).

The purchase price was set as follows in the APA:

...

# ARTICLE 3
# PURCHASE PRICE

**3.1    Purchase Price**

Subject to the adjustments provided for in Sections 3.2 and 3.4, the amount payable by the Purchaser for the Purchased Assets (the "Purchase Price"), exclusive of the Assumed Liabilities and all applicable sales and transfer taxes, shall be amount of $950,000.

**3.2    Payment of Purchase Price**

The Purchase Price shall be payable by the Purchaser to the Vendor as follows:

(a) $600,000 payable on the Closing Date by wire transfer to Vendor, or, at Purchaser's election such amounts as are necessary to satisfy Vendor's obligations to, and obtain the release of the security interests held by, the secured parties set forth on Schedule 3.2, and the balance to Vendor;

(b) the balance of Purchase Price of $350,000 shall be payable by way of wire transfer or certified cheque as follows, subject to the adjustments provided in this section and the Purchase Price Adjustments provided in Section 3.4:

   (i) $125,000, 7 months following the Closing Date;

   (ii) $125,000, if EBITDA of the Business for the fiscal year ending on November 30, 2004 is not less than $250,000 for such period. If EBITDA for such period is less than $250,000 but more than $200,000, then the amount to b paid under this paragraph shall be equal to 20% of such EBITDA amount. Any amount payable under this paragraph shall be paid by the Purchaser to the Vendor 30 days after the date on which the financial statements for such fiscal year are available; and

   (iii) $100,000, if EBITDA of the Business for the fiscal year ending November 30, 2005 is not less than $350,000. If EBITDA for such period is less than $350,000 but more than $300,000, then the amount to be paid under this paragraph shall be equal to 10% of such EBITDA amount. Any amount shall be paid by the Purchaser to the Vendor 30 days after the date on which the financial statements for such fiscal year are available; and

(c) by the assumption by the Purchaser of the Assumed Liabilities at their book value at the Closing Date.

**3.3    Delivery of Closing Date Financial Statements**

As soon as reasonably practicable after the Closing date and in any event not later than 45 days thereafter, the Vendor shall deliver to the Purchaser the Closing Date Financial Statements. The Parties shall cooperate fully in the preparation of the Closing Date Financial statements.

**3.4    Purchase Price Adjustments**

The balance of the Purchase price under Section 3.2(b) is subject to the adjustments provided in Section 3.2(b)(ii) and 3.2(b)(iii) and to the adjustments provided in this Section 34:

(a) The Purchase Price shall be reduced, on a dollar-for-dollar basis (the "Purchase Price Reduction") by the sum of the following amounts, which amount shall be

        deducted firstly form the amount payable under Section 3.2(b)(i) and then, if necessary, Section 3.2(b)(ii), and finally, if necessary, Section 3.2(b)(iii), as the case may be:

    (i)    The amount, if any, by which the Net operating Assets as shown on the Closing Date Financial Statements are less than $350,000; and

    (ii)    The amount computed by multiplying 4.83 times the amount, if any, by which $255,000 exceeds Vendor's EBITDA for the eight (8) month period ended August 31, 2003.

The Net Operating Assets amount, as reduced by the Purchase Price Reduction, if any, shall be the "Reduced Purchase Price."

    (b)    The aggregate amount of the Net Operating Assets set forth in 3.4(a)(i) above shall be redetermined as of 120 days and 180 days following the Closing Date, and the Purchase Price and Reduced Purchase Price shall be redetermined pursuant to such Section 3.4(a), and further reduced, if at all, in accordance with the provisions of such Section, to the extent of the following:

    (i)    On the 120th day following the Closing Date, the aggregate unpaid amount of any Accounts Receivable (less any reserve previously established in determining the Net Operating Asset amount)(the "Unpaid Accounts Receivable") shall be deducted from the Net Operating Assets amount, or the Reduced Purchase Price, as the case may be, to the extent that the Net Operating Assets amount has been previously reduced in accordance with 3.4(a).  At the election of Vendor, (A) any such Unpaid Accounts Receivable shall be assigned to Vendor, and Vendor may undertake any collection activity it deems reasonable in its sole discretion to collect such amounts, or (B) Vendor may allow Purchaser to continue to collect such Accounts Receivable for the benefit and the account of Vendor, and Purchaser shall, on a monthly basis, transfer and remit to vendor all such amounts received by or paid to Purchaser.

    (ii)    the aggregate value of any Inventories that remain unsold on the 180th day following the Closing Date (the "Unsold Inventories") shall be deducted form [sic] the Net Operating Assets amount, or the Reduced Purchase Price, as the case may be, to the extent that the Net Operating Assets (or the Reduced Purchase Price) amount has been previously reduced in accordance with 3.4(a) or 3.4(b)(i).. [sic] At the election of the Vendor, (A) the Unsold Inventories shall be conveyed and transferred to Vendor and Vendor shall be free, notwithstanding any other provision of this Agreement or the Ancillary Agreements, to dispose of the Unsold Inventories in any manner it deems fit, including retail sale, wholesale sale, or manufacturer return for credit, or (B) Vendor may allow Purchaser to continue to sell such Unsold Inventories in the ordinary course of business for the benefit and the account of the Vendor, and Purchaser shall, on a monthly basis, account to vendor and remit the entire amount received form the sale of such Unsold Inventories to Vendor.

    **3.5**    **Objection to Closing Date Financial Statements**

    **(a)**    **Delivery of Objection Notice** - In the event that the purchaser objects to any item of the Closing date Financial Statements, the Purchaser shall so advise the

>    Vendor by delivery to the Vendor of a written notice (the "Objection Notice") within 10 days after the delivery to the Purchaser of the Closing Date Financial statements. The Objection Notice shall set out the reasons for the Purchaser's objection as well as the amount in dispute and reasonable details of the calculation of such amount.
>
>    **(b)** **Resolution of Disputes** - The Vendor and the Vendor's auditors shall give the Purchaser and its accountants sufficient access to the Books and Records and working papers of the Vendor and the Vendor's auditors used in the preparation of the Closing Date Financial Statements to enable the Purchaser to exercise its rights under this Section. The Vendor and the Purchaser shall attempt to resolve all of the items in dispute set out in any Objection Notice within 30 days of receipt of the Objection Notice by the Vendor and the Vendor shall instruct the Vendor's auditors to assist in that resolution. Any items in dispute not resolved within such 30 day period shall be referred as soon as possible thereafter by the Vendor and the Purchaser to the Independent Auditor. The Independent Auditor shall act as an expert and not as an arbitrator and shall be required to determine the items in dispute that have been referred to it as soon as reasonably practicable but in any event not later than 30 days after the date of referral of the dispute to it. In making its determination, the Independent Auditor will only consider the issues in dispute placed before it. The Vendor and the Purchaser shall provide or make available, and shall cause the Vendor's auditors to provide or make available, all documents and information as are reasonably required by the Independent Auditor to make its determination. The determination of the Independent Auditor shall be final and binding on the Parties and the Closing Date Financial Statements shall be (or not be) adjusted as required by such determination.
>
>    (c)  Audit expenses - The fees and expenses of the Vendor's auditors in acting in accordance with this Article 3 shall be paid by the Vendor. The fees and expenses of the Independent Auditor in acting in accordance with this Article 3 shall be shared equally by the Purchaser and the Vendor, unless the Independent Auditor determines otherwise.
>
>    **(d)** **Payment in Accordance with Determination** - Within 5 days after resolution, by agreement of the Parties, of the dispute which was the subject of the Objection Notice or, failing such resolution, within 5 days after the final determination of the Independent Auditor, the Vendor or the Purchaser, as the case may be, shall pay to the other the amount owing as a result of such resolution or final determination.

Dkt. 16, Exh. B, at 10-13. *Emphasis in the original.*

The APA was executed on September 12, 2003. Dkt. 16, Declaration of Victoria Rucshner, at 2. The closing date was September 30, 2003, the date that Richelieu paid the Rucshners $600,000. The Rucshners provided Closing Date Financial Statements to Richelieu on October 15, 2003. *Id*., at 3, and Exh. C. On Richelieu's request, the Rucshners provided subsequent financial information to Richelieu on December 12, 2003 and March 24, 2004. Dkt. 16, Exh. D and E.

In 2004, Richelieu engaged Ernst & Young LLP (Ernst & Young) to determine whether a Purchase Price Reduction was required pursuant to Section 3.4(a) of the APA. On July 28, 2004,

ORDER
Page - 4

Ernst & Young provided Richelieu with its analysis. Dkt. 21, Exh. 1. Ernst & Young determined that Pacific Coast's total net operating assets were $193,577.09; the minimum required [presumably under § 3.2(b) of the APA] was $350,000; and the amount due to Richelieu was $156,422.91. *Id*. at 8.

The Ruchsners filed a civil action in Pierce County Superior Court for breach of contract and fraud in the inducement, and tortious interference with business expectancy. On March 9, 2005, Richelieu removed this action to federal court on the basis of diversity of citizenship. Dkt. 1. On March 21, 2005, the Rucshners filed the First Amended Complaint. Dkt. 6. The amended complaint alleges breach of contract and fraud in the inducement, tortious interference with business expectancy, and sexual discrimination in violation of RCW 49.60.180. On April 1, 2005, Richelieu filed an answer and alleged counterclaims for conversion against Pacific Coast Supply, LLC, and against the Rucshners. Dkt. 8. The counterclaims alleged conversion of Accounts Receivable and Fixed Assets. *Id.*

The Rucshners have now filed a motion for partial summary judgment for breach of contract (Dkt. 15), and a motion for partial summary judgment to dismiss Richelieu's counterclaims for conversion (Dkt. 17).

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed.R.Civ.P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 .S. 242, 253

(1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*. Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

## DISCUSSION

**1.    Plaintiffs' Motion for Partial Summary Judgment for Breach of Contract**

On July 21, 2005, the Rucshners filed a motion for partial summary judgment for breach of contract. Dkt. 15. The Rucshners contend that Richelieu has not paid them the $125,000 due them 7 months after closing, pursuant to Section 3.2(b)(i) of the APA. The Rucshners request that the court find that Richelieu breached the contract by failing to pay the $125,000 under the terms of the APA and enter an order granting their request for partial summary judgment on this $125,000. The Rucshners claim that Richelieu breached the APA in other respects, but those claims, as well as claims for sexual discrimination, are not at issue in this motion for partial summary judgment.

Richelieu opposes the motion, arguing that Richelieu was not required to pay the $125,000 because this payment was subject to the adjustments provided for in Sections 3.2 and 3.4 of the APA. Dkt. 20. By letter dated July 28, 2004, the accounting firm of Ernst & Young determined that Pacific Coast's Net Operating Assets were $193,577.09, which is $156,422.91 less than $350,000. Richelieu claims that, pursuant to Section 3.4(a)(i) of the APA, the $125,000 payment to be due 7 months after closing was to be reduced by $156,422.91, which means that Richelieu was not obligated to make any part of the $125,000 payment due under Section 3.2(b)(i). Richelieu also contests whether the

Rucshners have standing to sue to recover the $125,000, arguing that the payment is owed to Pacific Coast. Dkt. 20 at 5 n.2.

In their reply, the Rucshners claim that the letter from Ernst & Young did not excuse Richelieu's obligation to make the $125,000 payment to Pacific Coast by the April 30, 2004, deadline. Dkt. 22. The Ruchsners argue that Richelieu's failure to comply with the procedure set forth in Section 3.5 of the APA for objecting to the Closing Date Financial Statements the Ruchsners had provided on October 15, 2003, precluded Richelieu from withholding the $125,000. On August 16, 2005, Richelieu filed a surreply, requesting that the court strike this argument in the Ruchsner's reply. Dkt. 26. Richelieu contends that Pacific Coast failed to comply with its obligation under Section 3.3 of the APA to deliver adequate Closing Date Financial Statements within 45 days after the Closing Date, and in fact provided financial documents to Richelieu as late as March 24, 2004, and June 14, 2004. Richelieu further argues that nothing in the APA suggests that the Purchase Price Reductions became inoperative if Richelieu failed to timely assert objections to Pacific Coast's Closing Date Financial Statements. It also contends that summary judgment would be premature because the Rucshners filed their motion before any discovery had taken place. On August 17, 2005, the Rucshners filed an objection to Richelieu's surreply, contending that the surreply did not comply with Local Rule CR 7(g)(1); that the surreply should be stricken because it is merely additional argument on a point raised by the Rucshners in their original motion for partial summary judgment; and that Richelieu's claim that the summary judgment motion is premature is inaccurate because there has been extensive discovery in this case, and in any event, the request does not comply with the requirements of Fed.R.Civ.P. 56(f). Dkt. 27.

As a threshold matter, this court must address Richelieu's argument that summary judgment on the breach of contract claim would be premature because neither party had served discovery requests at the time the plaintiffs filed the motion for partial summary judgment. Richelieu raises this argument for the first time in its surreply. Dkt. 26 at 2 ("At a minimum, Plaintiffs' Reply points out that its Motion for Partial Summary Judgment is premature, given that at the time it was filed, neither party had served interrogatories, document requests, deposition notices or requests for admission."). Richelieu does not cite any authority for the proposition that summary judgment on the Rucshners'

breach of contract claim would be premature and makes no mention of Rule 56(f), which permits the court to deny summary judgment or order a continuance if the party opposing the motion demonstrates reasons why it is unable to present facts essential to its opposition to the motion. Fed.R.Civ.P. 56(f). The burden is on the nonmoving party to establish that it is unable to point to facts sufficient to withstand summary judgment by virtue of the lack of discovery and that proceeding with additional discovery would produce evidence sufficient to defeat summary judgment. *Mackey v. Pioneer Nat'l Bank*, 867 F.2d 520, 524 (9th Cir. 1989). While Richelieu does contend that discovery was incomplete at the time the Rucshners filed their motion for partial summary judgment on the breach of contract claim, it fails to demonstrate that the reason for its inability to withstand the motion for summary judgment is because the materials currently available to it are insufficient and that proceeding with discovery would uncover materials enabling it to withstand summary judgment. Richelieu has failed to persuade the court that summary judgment would be premature at this juncture.

In a footnote to its response, Richelieu also contends that the Rucshners lack standing to sue for the remaining balance of the purchase price because the APA defines Pacific Coast as the Vendor in the contract. Richelieu does not contest Pacific Coast's standing, which is a named party to this lawsuit. Thus, the motion for partial summary judgment is properly before the court and can be decided at this time.

The issue presented by the parties is purely one of contract construction. Under the rule of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), "federal courts sitting in diversity jurisdiction apply state substantive law and federal procedural law." *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996). As the Washington Supreme Court has noted, courts asked to enforce a contract may be called upon to either interpret or construct a contract's terms. *Berg v. Hudesman*, 115 Wn.2d 657, 663 (1990). Interpretation requires the court to determine the meaning of a contract term and is necessary when a contract is incomplete or ambiguous. *Id.* at 662-63. To do so, courts consider evidence establishing the objective manifestations of the intent of the parties. *Id.* at 667. Conflicting evidence of the parties' intentions must be resolved by a jury. *Id.* at 668. Contract construction, on the other hand, requires the court to determine the legal consequences that flow from a contract's terms. *Id.* at 663. Rather than determining a contract's meaning, the court must determine the legal effects of

the contract. Contract construction is a purely legal question, and is therefore appropriate for resolution at the summary judgment stage. *See Byrne v. Ackerlund*, 108 Wn.2d 445, 455 (1987). The parties to this case are in agreement as to the meaning of the terms of the APA but disagree as to whether withholding payment of the $125,000 due 7 months after closing, without objecting to the Closing Date Financial Statements as provided under Section 3.5, constitutes a breach of the APA. *See* Dkt. 15 at 8 ("the only dispute relates to the legal effect of the language in the APA that pertains to Richelieu's purchase of PCS"), Dkt. 20 at 5 ("the Asset Purchase Agreement plainly provides that the $125,000 Payment shall reduced [sic]"). Therefore, the court's role in this case is one of construction rather than interpretation.

The role of the court in constructing a contract is to effect the intent of the parties in a practical and reasonable way. *Eurick v. Pemco Ins. Co.*, 108 Wn.2d 338, 341 (1987). Courts cannot ignore provisions that have been agreed to and negotiated for, nor can courts create provisions that were not intended by the original agreement. *See Seattle Professional Engineering Employees Ass'n v. Boeing Co.*, 139 Wn.2d 824, 833 (2000). Because contract construction is a question of law, this court is bound by the plain language of the contract and will not stray beyond its four corners in constructing contractual provisions. *See Byrne*, 108 Wn.2d at 455. The contract at issue in this case, the APA, contains extensive provisions regarding the valuation of the assets; detailing the purchase price; providing for adjustments; and specifying a procedure for objecting to financial statements and resolving disputes. *See* Dkt. 16, Exh. B, at 10-13. The parties do not contend that the APA is an incomplete or ambiguous representation of their intent, nor do they ask the court to look beyond the four corners of the contract. Therefore, in light of both the specificity of the terms at issue and the fact that Section 1.4 of the APA specifies that the APA is exhaustive of the entire agreement among the parties, the court will consider only what is contained within the contract, in light of the arguments of both parties.

There are several common law rules aiding judicial construction of contracts. These rules are merely aids to construction, however, and are not necessary in every case. *Eurick*,108 Wn.2d at 340-41. First, parties are deemed to contract in reliance upon existing law, so any statute affecting the subject matter of a contract is incorporated therein. *Wagner v. Wagner*, 95 Wn.2d 94, 98 (1980).

Second, contracts are construed against the drafter, who is presumed to be in a better position to prevent ambiguities and mistakes. *Continental Ins. Co. v. PACCAR, Inc.*, 96 Wn.2d 160, 167 (1981). Third, contracts are to be constructed in a manner that comports with the public interest. *State Farm General Ins. Co. v. Emerson*, 102 Wn.2d 477, 481 (1984). This rule of construction is of limited application, however, because public policy concerns must be supported by specific legislative or judicial decrees. *See id*.

Additionally, Washington courts employ several presumptions when constructing contracts. Courts presume that parties contract in good faith, *Liebergessell v. Evans*, 93 Wn.2d 881, 892 (1980), and that a contract susceptible to both reasonable and unreasonable constructions intends to produce the reasonable result. *Byrne*, 108 Wn.2d at 454. While the Rucshners impliedly urge the court to construe the APA against the drafter (Richelieu), the inescapable legal effect of the APA stems from its plain language.

Based upon the plain and unambiguous language of the APA, the plaintiffs have demonstrated that there are no genuine disputes of material facts precluding summary judgment. The Rucshners contend that Richelieu is in breach of Sections 3.2, 3.4, and 3.5 of the APA by virtue of its refusal to furnish the $125,000 payment due 7 months from closing. Dkt. 22 at 5. Richelieu argues that it was not obligated to furnish any part of the $125,000 by virtue of the APA's Purchase Price Adjustments provision contained in Section 3.4. Richelieu is correct insofar as it argues that the Purchase Price Adjustment provision allows for a reduction of the purchase price to the extent that Pacific Coast's Net Operating Assets amount to less than $350,000. Ernst & Young, an accounting firm, determined that Pacific Coast's Operating Assets were only $193,577.09, which Richelieu contends entitled Richelieu to a purchase price reduction of at least $156,422.91. This conclusion is based upon an incomplete and isolated reading of Section 3.4, however. The Purchase Price Adjustments provision provides for a dollar-for-dollar reduction in purchase price by "[t]he amount, if any, by which the Net Operating Assets *as shown on the Closing Date Financial Statements* are less than $350,000." *Emphasis added.* Other portions of the APA are consistent with this reading. For example, the APA defines Net Operating Assets as "the difference between the book value of the Purchased Assets and the Assumed Liabilities *as shown on the Closing Date Financial Statements.*" *Emphasis added.* In

contrast, Richelieu claims it is entitled to a reduction in purchase price by the amount by which the Net Operating Assets *as calculated by Ernst & Young* are less than $350,000. By its plain terms, the Purchase Price Adjustments provision requires that adjustments be made on the basis of the Closing Date Financial Statements furnished to Richelieu by the Rucshners. In other words, the Purchase Price Adjustments provision does not contemplate the use of other documents, such as the letter from Ernst & Young, to serve as the basis for a purchase price reduction.

Richelieu does not contend that it objected to the Closing Date Financial Statements. Richelieu cannot circumvent the Section 3.5 objection procedure by failing to object to the Closing Date Financial Statements, yet soliciting accounting reports that conflict with those statements and using them to justify its refusal to pay the $125,000 required by Section 3.2(b)(i). The Purchase Price Adjustments provision in Section 3.4 requires the Purchaser to object to the Closing Date Financial Statements in order to base a purchase price reduction on figures other than those contained in the Closing Date Financial Statements. The fact that the Rucshners gratuitously provided extra documentation after the deadline for furnishing the Closing Date Financial Statements had expired did not relieve Richelieu of its obligation to make an objection before basing a purchase price reduction on something other than the Closing Date Financial Statements. In light of the fact that Richelieu did not object to *any* of the documents the Rucshners provided, Richelieu had no basis for withholding the $125,000 payment and therefore breached the APA. Having determined that Richelieu was in breach of the APA on the basis that Richelieu reduced the purchase price using figures other than those contained in the Closing Date Financial Statements, the court need not address the Rucshners' argument that Richelieu waived its right to reduce the purchase price. Based upon the foregoing discussion, the court should grant the plaintiffs' motion for partial summary judgment of $125,000. This conclusion is, in no way, intended to fix the final contract purchase price.

**2.     Plaintiffs' Motion for Partial Summary Judgment to Dismiss Defendant Richelieu America, LTD.'s Counterclaims for Conversion**

On July 27, 2005, the Rucshners filed a motion for summary judgment, requesting that the court dismiss Richelieu's counterclaims for conversion. Dkt. 17. The Rucshners contend that Pacific Coast did not convert any Accounts Receivable that rightfully belonged to Richelieu, and that there is no admissible evidence creating a disputed issue of material fact on this point. The Rucshners

1  provided bank statements, and declarations stating that they did not collect the $108,084.97 in
2  Accounts Receivable, and that they did not take any of the items that Richelieu contends are missing,
3  and that there is no admissible evidence creating a disputed issue of material fact on this claim.

4  On August 15, 2004, Richelieu filed a response opposing this motion for summary judgment.
5  Dkt. 23.  Richelieu contends that there are factual issues that preclude summary judgment and,
6  alternatively, that the summary judgment motion is premature because all of the facts have not been
7  developed.  Richelieu contends that the Ernst & Young report determined that Pacific Coast collected,
8  but did not turn over to Richelieu, $108,084.97 in Accounts Receivable; and that some of the items it
9  acquired as Fixed Assets are missing, and it is reasonable to conclude that the Rucshners have willfully
10 and without justification retained them.

11 Richelieu has presented sufficient evidence to create a genuine dispute of material fact as to
12 whether Pacific Coast converted $108,084.97 in Accounts Receivable. In support of its counterclaim
13 for conversion of Accounts Receivable, Richelieu offers the analysis of Ernst & Young, the accounting
14 firm Richelieu hired to determine whether it was entitled to a purchase price reduction. Dkt. 21, Exh.
15 A, at 7. The Ernst & Young analysis concludes, "Pacific has collected Richelieu receivables bought up
16 to November and also paid some Richelieu assumed liabilities. The excess of amounts collected over
17 disbursement therefore represents an amount due to Richelieu." *Id.* According to the report, the
18 excess of Accounts Receivable collected by Pacific Coast over Richelieu's assumed liabilities paid by
19 Pacific Coast amounts to $108,084.97. *Id.* To refute this evidence, Pacific Coast offers evidence of its
20 banking activity to support the contention that Pacific Coast never collected any money on accounts
21 that rightfully belonged to Richelieu. A jury is required to settle this factual dispute. Contrary to the
22 Rucshners' assertion, the Ernst & Young report is sufficiently probative to create a genuine issue of
23 material fact that requires resolution by a jury.

24 The Rucshners urge the court to ignore the facts contained in the Ernst & Young report
25 because it is not authenticated. Rule 56 provides that affidavits supporting or opposing a motion for
26 summary judgment "shall be made on personal knowledge, [and] shall set forth such facts as would be
27 admissible in evidence." Fed.R.Civ.P. 56(e). The inquiry into the admissibility of the evidence
28 supporting Richelieu's opposition to the motion for summary judgment is focused upon the facts
   themselves rather than the report from which they originate. Furthermore, the inquiry into admissibility

is made to determine whether the facts would be admissible and not to determine whether to admit the Ernst & Young Report. Therefore, the facts in the report are sufficiently authenticated by the affidavit of Georges Albert (Dkt. 21), and the report need not be further authenticated at this stage of the proceedings.

The Rucshners also contend that the Ernst & Young report should not be considered in support of Richelieu's opposition to the motion for summary judgment because it constitutes hearsay. In support of its response, Richelieu offers the declaration of Georges Albert. Mr. Albert declares under penalty of perjury that he has personal knowledge of the matters set forth in his declaration. Dkt. 21 at 1. He declares that "the Purchase Price Reductions required by §§3.4(a)(i) and (ii) exceeded $125,000." Dkt. 21 at 3. Because it is supported by Mr. Albert's personal knowledge, this fact would be admissible in evidence and is therefore a proper basis upon which to deny the Rucshners' motion for summary judgment.

There is also a genuine issue of material fact as to whether the Rucshners converted certain Fixed Assets, including various pieces of equipment. The Rucshners contend that the mere fact that equipment was found missing seventeen months after Richelieu purchased the assets does not establish that the equipment was converted by the Rucshners. In support of their counterclaim, Richelieu contends that the Rucshners were the principals of Pacific Coast and operated the company during the time when the equipment went missing. This factual dispute must be resolved by a jury. Taking the facts in the light most favorable to Richelieu, the nonmoving party, there are genuine issues of material fact precluding summary judgment on the claim that the Rucshners converted Richelieu's fixed assets and the court, therefore, should deny the plaintiffs' motion for partial summary judgment on the counterclaims for conversion.

Because the court has concluded that genuine issues of material fact preclude summary judgment on Richelieu's counterclaims for conversion, it need not reach Richelieu's alternative argument that ruling on the motion should be continued until after discovery has proceeded.

Therefore, it is hereby

**ORDERED** that Plaintiffs' Motion for Partial Summary Judgment for Breach of Contract (Dkt. 15) is **GRANTED**. Plaintiffs' Motion for Partial Summary Judgment to Dismiss Defendant Richelieu America, LTD.'s Counterclaims for Conversion (Dkt. 17) is **DENIED**.

1     The Clerk is directed to send uncertified copies of this Order to all counsel of record and to
2 any party appearing *pro se* at said party's last known address.
3     DATED this 6th day of September, 2005.

                                        Robert J. Bryan
                                        United States District Judge